[No. 7903.   Department Two.   June 1, 1909.]

MARY E. TOWN, *Respondent*, v. MEDOREM W. GREER *et al.*, *Appellants.*[1]

DEEDS—DESCRIPTION—INTENT—MISTAKE—VENDOR AND PURCHASER —BOUNDARIES—MARKED ON GROUND. A deed of the southwest quarter of a section is shown by the contemporaneous acts of the parties to have been executed by mistake as to the description of the tract intended to be conveyed, where it appears that the government quarter corner on the west side of the section was originally located by mistake nearly twenty chains north of its proper location, that when the deal was made this fact was unknown to the purchaser, who refused to consummate the deal until all the corners were located by a survey, whereupon a deputy county surveyor, with the parties attending, located all the corners except the unknown quarter corner, which could not be found, and which he re-established half-way between the north and south lines of the section, and that the deal was thereupon consummated by the deed in question, and a fence was built on the line established by the survey, and possession taken and maintained by the parties for years in accordance with such survey and in ignorance of the true location of the quarter corner.

Appeal from a judgment of the superior court for Pierce county, Chapman, J., entered October 31, 1908, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, in an action of ejectment. Reversed.

[1]Reported in 102 Pac. 239.

*John A. Shackleford* and *Hayden & Langhorne*, for appellants.

*Ira A. Town, John C. Stallcup*, and *M. B. Stallcup*, for respondent.

Parker, J.—This is an action of ejectment tried by the court without a jury, in which the plaintiff seeks to recover from the defendants a tract of land described in her complaint as follows:

"Beginning at a point on the west line of section number thirty (30), township number twenty (20) north, range three (3) east of the W. M., forty (40) chains north of the southwest corner of said section, run thence east parallel with the south line of said section, thirty-seven and two one-hundredths (37.02) chains to a line connecting the quarter posts on the north and the south lines of said section; thence north on said last mentioned line, seven and three-fourths (7¾) chains to the intersection of the line connecting the quarter posts on the east and west lines of said section; thence westerly, bearing northerly along said last mentioned line to the quarter post on the west line of said section, (which quarter post is 55.9) chains north of the southwest corner of said section; thence south on said west line of said section to place of beginning, excepting from above description the south ten acres thereof, extending of even width across the south side from east to west boundary."

Both parties claim title through mesne conveyances from George H. Greer and wife, who in 1882 owned all of the west half of the section. On October 10, 1882, George H. Greer and wife conveyed to William Squire, by warranty deed, land therein described as the southwest quarter of this section, with other lands, in all 304 acres more or less; in 1895 Squire and wife executed a quitclaim deed to their daughter Hannah S. Ward for the land involved in this action, describing it as in plaintiff's complaint, including the ten-acre strip along the south boundary thereof; and in 1905, Hannah S. Ward and husband executed a quitclaim deed to the plaintiff for the land involved in this action, describing it as in plain-

tiff's complaint. The defendants are in possession of the land here involved, under conveyances from George H. Greer and wife.

Two main questions presented under the pleadings and evidence in this action are: First. Is the land here involved in the northwest or the southwest quarter of the section? And this in turn involves the dispute between the parties as to the original location of the quarter post or corner on the west line of the section; the plaintiff contending that it is 55.9 chains north of the southwest corner of the section, and the defendants contending that it is only 40 chains north of the southwest corner of the section, where the law presumes it to be. Second. Were the contemporaneous acts and understanding of the parties to the deed of October 10, 1882, whereby Greer and wife conveyed to Squire the southwest quarter of the section, such that the north line of the land thereby conveyed was a line 40 chains north of and parallel with the south line of the section? The pleadings are so framed as to present both of these questions. The accompanying plat shows the land in controversy, as well as the relative disputed locations of the quarter post on the west line of the section, tract "A" being the land in dispute, and "B" the ten-acre tract.

The trial court made findings favorable to the plaintiff's contention as to the original location of the quarter post be-

ing 55.9 chains north of the southwest corner of the section, and that the land involved is in the southwest quarter of the section, all of which was duly excepted to by the defendants' attorneys. The trial court also refused to make findings favorable to the defendants upon the question of the understanding and intention of the parties to the deed of October 10, 1882, from the Greers to Squire, as to the north boundary of the land conveyed, which findings were requested and their refusal excepted to by the defendants' attorneys so as to present that question here for review. Judgment was rendered by the court for the plaintiff, from which the defendants have appealed to this court.

From a careful reading of all of the evidence, we conclude that the following facts are established, touching the question of the intention of the parties to the deed of October 10, 1882, as to the north boundary of the land conveyed. At the time of the negotiations between the parties leading up to the making of the deed from the Greers to Squire of October 10, 1882, the location of the quarter corner on the west line of the section was unknown to them, there being no stake or monument at the point 40 chains north of the southwest corner and equidistant between southwest and northwest corners of the section, nor any stake, monument, or witness trees, at any other point on or near the west line of the section then known to them. Squire insisted that the boundaries and corners of the land that he was purchasing from Greer should be ascertained by survey before closing the transaction. Thereupon, in compliance with the understanding between them, Greer employed Charles H. Ballard, a deputy county surveyor of Pierce county, to locate the lines and corners, in order that Squire would be satisfied as to where such lines and corners were, and also as to the quantity of land he was acquiring, it being then understood between the parties that the amount of land to be conveyed was 300 to 304 acres.

Ballard testifies that, just before commencing the survey,

he had a conversation with Squire, in which "Mr. Squire said that he would not pay any money on the place until each corner was established by the county surveyor or his deputy." Squire also testifies, "It was not my intention to pay anything on the price of the land until I knew that I was getting the amount of land I supposed I was getting." Greer's testimony touching the attitude of both himself and Squire upon this matter is along the same line. Ballard proceeded with the survey accordingly, both Greer and Squire accompanying him a considerable portion of the time he was at work. When he came to the locating of the quarter post or corner on the west line of the section, he was unable to find the corner or witness trees called for in the government field notes, a copy of which he had with him. He then (using his own words) "Re-established said corner by chaining the whole of the west boundary of said section thirty, and placing said corner equidistant from the northwest and southwest corners." He also established the center of the section at the crossing of the lines from opposite quarter corners. He was able to find the original location of all the other quarter corners and section corners by the witness trees or monuments. There is no evidence in the record indicating that any of these were established upon the ground by the government survey at any other points than the law presumes them to be, except the quarter corners on the north and south boundaries of the section are nearer the west than east boundary because the west boundary is also the township boundary, resulting in fractional subdivisions on the west. This survey of Ballard's demonstrated that the land was approximately the amount Squire believed he was acquiring. Thereafter the purchase was consummated, and the deed of October 10, 1882, executed. Soon thereafter a fence was built upon the land, running east from the quarter corner as established by this survey. This fence was built by consent of Squire if not at his instance. Greer maintained possession up to the fence on the north side, while Squire maintained possession

up to the fence on the south side. This continued for some years, but just how long is uncertain. In any event after the fence was removed, as it seems to have been some years later, and the land again became unenclosed on both sides of the line, neither party or their respective grantees ever assumed possession beyond the line where the fence had been originally constructed.

It is plain from the evidence that the quarter corner established by Ballard's survey, and the line running east therefrom on which the fence was built, is the same point and line, 40 chains north of the south line of the section, described in the quitclaim deed of Squire and wife to Hannah S. Ward in 1895, and described in the quitclaim deed of Hannah S. Ward and husband to the plaintiff in 1905, and also described in plaintiff's complaint in this action. Some four or five years after the sale and conveyance of October 10, 1882, from Greer to Squire was consummated, certain trees seeming to answer the description of quarter corner witness trees called for in the government field notes were discovered near the west line of the section, indicating that the original quarter corner was located 15.9 chains north of the quarter corner established by Ballard. Up to the time of the discovery of these trees, none of the parties had any knowledge by which they might be lead to believe or suspect that the true quarter corner was other than the one established by Ballard. Whatever effect these facts would have upon the rights of the original parties in determining the north boundary of the land conveyed, they would have the same effect upon the rights of Hannah S. Ward, grantee of Squire and wife, and the plaintiff, grantee of Hannah S. Ward and husband, since we are convinced from the evidence that these subsequent claimants to the land under Squire and wife had such knowledge as would bind them to take notice of such facts.

Assuming that the original location of the quarter corner by the government survey was at the point 15.9 chains north of the quarter corner established by Ballard, which

question we do not decide, we are of the opinion that the deed of October 10, 1882, from the Greers to Squire, was executed by mutual mistake as to the description of the southwest quarter, and that all the parties to that deed believed it conveyed, and they actually intended that it should convey, only the land south of the quarter corner and line running east therefrom, which was then established by Ballard, the deputy county surveyor, 40 chains north of the south line of the section, and on which the fence was thereafter built.

The defendants are in possession, and, while they are not seeking affirmative relief, the issues are so framed by the pleadings as to entitle them in their defense to prove mutual mistake and the real intention of the parties to the conveyance of October 10, 1882, as if they were seeking to reform the deed in a suit in equity. Under our system of procedure, "The superior title, whether legal or equitable, shall prevail." Pierce's Code, § 1144 (Bal. Code, § 3629). The mistake in this case was one of fact only. True, it was not a mistake in the language of the description in the deed, but it was a mutual mistake as to the land the language of the description applied to, if the original quarter section corner is as plaintiff claims. The following language from this court in *Jenkins v. Jenkins University*, 17 Wash. 160, 49 Pac. 247, 50 Pac. 785, where a mortgage was sought to be reformed, is quite applicable to this situation:

"It is true the terms of the mortgage were stated according to the intent of both parties, but there was a material error upon the part of both of them in respect to the thing to which the terms applied, and we are of the opinion that the authorities sustain the appellant's contention in this respect, and that he was entitled to a reformation of the instrument."

A mere glance at the accompanying plat will show how very far the government survey departed from the legally presumed location of the quarter corner, if the real quarter corner was located as claimed by the plaintiff. Such loca-

tion, at a point more than one-third of the distance from the equidistant point to the northwest corner of the section, was certainly such a location as these parties never contemplated as determining the north line of the land intended to be conveyed. It is true that when land is conveyed and described by a designated subdivision of a section it ordinarily means the government subdivision. But this is not necessarily true under all circumstances. As was said by this court in *Squire v. Greer*, 2 Wash. 209, 26 Pac. 222, a case involving this same land:

"This was a conveyance between private parties; and if the intention was to convey a certain definite piece of land, and especially if the land was actually located, that could be shown, or any circumstance tending to show the intention of the parties. In conveyances by private parties descriptions by legal subdivisions are used for convenience, and it would be a hard and unjust rule to hold parties to a conveyance of property not intended to be conveyed, through mistaken understanding of where a government line was located, especially when it can be shown that the government survey was misleading, and the lines of survey deviated from their proper and intended course."

Our conclusions upon this branch of the case renders it unnecessary to discuss other questions involved. We are of the opinion that the defendants are entitled to the relief prayed for in their answer, which is that "The plaintiff take nothing by her action, that this cause be dismissed and that the defendants have their costs and disbursements herein." The judgment of the superior court is reversed, with instructions to enter judgment in defendants' favor as prayed for.

RUDKIN, C. J., DUNBAR, MOUNT, and CROW, JJ., concur.